## IN THE UNITED STATES DISTRICT COURT
## FOR THE WESTERN DISTRICT OF VIRGINIA
## BIG STONE GAP DIVISION

| | | |
|---|---|---|
| **PEGGY A. ADAMS,** | ) | |
| Plaintiff | ) | |
| | ) | |
| v. | ) | Civil Action No. 2:05cv00024 |
| | ) | **REPORT AND** |
| | ) | **RECOMMENDATION** |
| | ) | |
| | ) | |
| **JO ANNE B. BARNHART,** | ) | |
| **Commissioner of Social Security,** | ) | By:   PAMELA MEADE SARGENT |
| Defendant | ) | United States Magistrate Judge |

*I. Background and Standard of Review*

Plaintiff, Peggy A. Adams, filed this action challenging the final decision of the Commissioner of Social Security, ("Commissioner"), denying plaintiff's claims for disability insurance benefits, ("DIB"), and supplemental security income, ("SSI"), under the Social Security Act, as amended, ("Act"), 42 U.S.C. §§ 423 and 1381 *et seq.* (West 2003 & Supp. 2005). Jurisdiction of this court is pursuant to 42 U.S.C. § 405(g). This case is before the undersigned magistrate judge by referral pursuant to 28 U.S.C. § 636(b)(1)(B). As directed by the order of referral, the undersigned now submits the following report and recommended disposition.

The court's review in this case is limited to determining if the factual findings of the Commissioner are supported by substantial evidence and were reached through

Case 2:05-cv-00024-JPJ-PMS   Document 20   Filed 01/10/06   Page 1 of 23   Pageid#: 157

application of the correct legal standards. *See Coffman v. Bowen*, 829 F.2d 514, 517 (4th Cir. 1987). Substantial evidence has been defined as "evidence which a reasoning mind would accept as sufficient to support a particular conclusion. It consists of more than a mere scintilla of evidence but may be somewhat less than a preponderance." *Laws v. Celebrezze,* 368 F.2d 640, 642 (4th Cir. 1966). "'If there is evidence to justify a refusal to direct a verdict were the case before a jury, then there is "substantial evidence."'" *Hays v. Sullivan*, 907 F.2d 1453, 1456 (4th Cir. 1990) (quoting *Laws*, 368 F.2d at 642).

The record shows that Adams filed applications for DIB and SSI in April 1996, alleging disability as of March 20, 1996. (Record, ("R."), at 13.) These claims were denied initially, on reconsideration and by an administrative law judge, ("ALJ"), in a decision dated October 15, 1997. (R. at 13.) The Appeals Council denied Adams's request for review of the ALJ's decision, which then stood as the Commissioner's final decision. (R. at 13.) Thereafter, Adams filed a civil action in this court. (R. at 13.) In December 1999, while this case was pending in this court, Adams filed subsequent applications for DIB and SSI. (R. at 13.) These claims also were denied initially and on reconsideration. (R. at 13.) Adams requested a hearing by and ALJ. (R. at 13.) On the Commissioner's motion, this court remanded Adams's 1996 claims for further proceedings. (R. at 13.) On remand, the 1996 claims were consolidated with the 1999 claims for hearing. (R. at 33.) Both claims were denied by the ALJ in a decision dated November 16, 2000. (R. at 32-41.) Adams again filed a civil action in this court, and by order entered April 25, 2005, Adams's motion for summary judgment was denied and the ALJ's decision denying benefits was affirmed. *See Adams v. Barnhart*, No. 2:03cv00140 (April 25, 2005).

Case 2:05-cv-00024-JPJ-PMS   Document 20   Filed 01/10/06   Page 2 of 23   Pageid#: 158

Adams protectively filed her current claims for DIB and SSI on April 4, 2001, alleging disability as of March 22, 1996, based on back pain, hypertension and a family history of breast cancer. (R. at 62-65, 69, 409-13.) These claims were denied initially and on reconsideration. (R. at 47-49, 52, 54-55, 416-18, 422-23.) Adams then requested a hearing before an ALJ. (R. at 56.) This hearing was held on April 8, 2004, at which Adams was represented by counsel. (R. at 459-87.)

By decision dated May 27, 2004, the ALJ denied Adams's claims. (R. at 13-23.) The ALJ found that Adams met the disability insured status requirements of the Act for disability purposes through December 31, 2001.[1] (R. at 22.) The ALJ found that Adams had not engaged in substantial gainful activity since March 22, 1996. (R. at 22.) The ALJ also found that the medical evidence established that Adams had severe impairments, namely degenerative disc disease, leg pain and asthma, but he found that Adams did not have an impairment or combination of impairments listed at or medically equal to one listed at 20 C.F.R. Part 404, Subpart P, Appendix 1. (R. at 20, 22.) The ALJ found that Adams's allegations regarding her limitations were not totally credible. (R. at 22.) The ALJ found that Adams had the residual functional capacity to perform light work[2] that required no prolonged standing or walking, no ladder climbing, no pushing or pulling of foot controls and no exposure to dust, fumes or other respiratory irritants. (R. at 22.) Based on Adams's age, education and past work history and the testimony of a vocational expert, the ALJ concluded that there

---

[1]Thus, in order to be eligible for DIB benefits, Adams must prove that she was disabled at some point on or prior to December 31, 2001.

[2]Light work involves lifting items weighing up to 20 pounds at a time with frequent lifting or carrying of items weighing up to 10 pounds. If someone can perform light work, she also can perform sedentary work. *See* 20 C.F.R. §§ 404.1567(b), 416.967(b) (2005).

was a significant number of jobs in the national economy that Adams could perform, including those of an inventory clerk, a cashier, an interviewer, an information clerk, a messenger and a general office clerk. (R. at 23.) Therefore, the ALJ concluded that Adams was not under a disability as defined by the Act and was not eligible for benefits. (R. at 23.) *See* 20 C.F.R. §§ 404.1520(g), 416.920(g) (2005).

After the ALJ issued his opinion, Adams pursued her administrative appeals, (R. at 9), but the Appeals Council denied her request for review. (R. at 5-8.) Adams then filed this action seeking review of the ALJ's unfavorable decision, which now stands as the Commissioner's final decision. *See* 20 C.F.R. §§ 404.981, 416.1481 (2005). The case is before this court on Adams's motion for summary judgment filed September 21, 2005, and on the Commissioner's motion for summary judgment filed November 22, 2005.

## *II. Facts and Analysis*[3]

Adams was born in 1955, (R. at 62), which, at the time of the ALJ's decision, classified her as a "younger person" under 20 C.F.R. §§ 404.1563(c), 416.963(c) (2005). She has a high school education[4] and past work experience as a sewing

---

[3]As the Commissioner correctly notes in her brief, the ALJ's November 16, 2000, determination that Adams was not disabled is res judicata. Thus, the relevant period currently before this court for determining whether Adams is disabled runs from November 17, 2000, through December 31, 2001, for DIB purposes and from November 17, 2000, through May 27, 2004, the date of the most recent ALJ's decision, for SSI purposes. Thus, only those medical records relevant to these time periods will be considered in this Report and Recommendation.

[4]At her hearing, Adams testified that she attended school through the twelfth grade, but failed typing by two points. (R. at 463.) She testified that she subsequently obtained her general equivalency development, ("GED"), diploma. (R. at 463.)

-4-

machine operator, a nurse's aide and a deli worker. (R. at 70, 75.)

At her hearing, Adams testified that she last worked as a sewing machine operator on March 20, 1996. (R. at 463-64.) She stated that prior to that, she had worked in a convenience store deli. (R. at 464-65.) Adams testified that the main problem that kept her from working was lower back pain that radiated into her hips, legs and feet. (R. at 465, 470.) She stated that she had experienced such pain since 1992, for which she took pain medication. (R. at 465.) Adams testified that she took three months off of work due to hypertension before she actually quit working in March 1996. (R. at 465.) She stated that she took Diovan, Norvasc and Hytrin for her hypertension, but that it had never been completely controlled. (R. at 467-68.)

Adams testified that she was unable to lift, bend or stoop due to back pain. (R. at 468.) She estimated that she could stand for 15 minutes without interruption, walk for less than an hour without interruption and sit for 15 minutes without interruption. (R. at 469.) Adams testified that she had to lie down for at least two hours each day with her legs elevated. (R. at 470.) She stated that, in addition to her back pain, she also experienced numbness in both legs when lying on each side. (R. at 470.) She stated that her back pain and menopausal symptoms resulted in her getting only one to two hours of sleep per night. (R. at 470-71.) Adams further testified that she was being treated for asthma and used an inhaler four times daily and began using a breathing machine daily in December 2003. (R. at 471-72, 479.) She stated that she had been hospitalized twice due to her asthma. (R. at 472.) She further testified that she took Darvocet for pain, Singulair for asthma, Prevacid for acid reflux and received Toradol injections for her back pain every two to three weeks. (R. at 473-74.) Adams

stated that Dr. Kiser had not referred her to a specialist for her back or asthma problems because she had no insurance. (R. at 479.) Finally, Adams testified that she had carpal tunnel syndrome in both "arms," for which she wore wrist braces at night, but she noted that her treating physician had recommended surgery. (R. at 475.) Adams, who is right-handed, stated that her hands would go numb causing difficulty gripping objects, and she noted that her right hand was worse than the left. (R. at 476.)

Adams testified that her husband performed the heavier household chores such as vacuuming, and that he performed all of the yardwork. (R. at 476-77.) She stated that she was able to perform some grocery shopping, usually with her husband's help. (R. at 477.) Adams testified that she was able to drive sometimes, but would not drive distances further than 10 miles. (R. at 478.)

Robert Spangler, a vocational expert, also was present and testified at Adams's hearing. (R. at 480-85.) Spangler classified Adams's work as a sewing machine operator as light and semiskilled. (R. at 481.) Spangler was asked to assume an individual of Adams's age, education and work history who could perform light work diminished by an inability to stand or walk for prolonged periods, who could not repetitively use foot controls, who could not climb ladders and who could not be exposed to excessive dust, fumes, chemicals or temperature extremes. (R. at 481.) Spangler testified that such an individual could perform the jobs of a cashier, an interviewer, an information clerk, a factory messenger, an inventory clerk and a general office clerk. (R. at 482.) Spangler was next asked to assume the same individual, but who could not repetitively use her hands due to carpal tunnel syndrome

Case 2:05-cv-00024-JPJ-PMS   Document 20   Filed 01/10/06   Page 6 of 23   Pageid#: 162

symptoms. (R. at 482.) Spangler testified that such an individual could not perform the jobs previously mentioned. (R. at 482.) Likewise, Spangler testified that if the individual's pain was of such a severity and frequency that it frequently interfered with her ability to concentrate and persist at work tasks, no jobs would be available. (R. at 483.) Next, Spangler was asked to assume a hypothetical individual who was limited as set forth in Dr. Kiser's January 20, 2004, assessment. (R. at 354-57, 483.) Spangler testified that such an individual would be unable to perform any jobs. (R. at 483.) Spangler also testified that an individual with the limitations set forth in Dr. Molony's assessment, dated August 3, 2000,[5] would not be able to work. (R. at 316-18, 483-84.) Finally, Spangler was asked to consider the same individual as set forth in the first hypothetical, but who could perform only sedentary work.[6] (R. at 484.) Spangler testified that such an individual could perform the sedentary jobs of an interviewer, an information clerk, an auditing clerk and a credit investigator. (R. at 484-85.)

In rendering his decision, the ALJ reviewed records from Dr. Kenneth Kiser, M.D.; Dr. Kevin Blackwell, D.O.; Dr. Richard M. Surrusco, M.D., a state agency physician; Dr. Donald R. Williams, M.D., a state agency physician; Dr. Patrick Molony, M.D.; and Bon Secours St. Mary's Hospital.

The Commissioner uses a five-step process in evaluating DIB and SSI

---

[5]I note that Dr. Molony's assessment was actually dated August 3, 2002. (R. at 316-18.)

[6]Sedentary work involves lifting items weighing up to 10 pounds at a time and occasionally lifting or carrying articles like docket files, ledgers and small tools. *See* 20 C.F.R. §§ 404.1567(a), 416.967(a) (2005).

claims.  *See* 20 C.F.R. §§ 404.1520, 416.920 (2005); *see also Heckler v. Campbell*, 461 U.S. 458, 460-62 (1983); *Hall v. Harris*, 658 F.2d 260, 264-65 (4th Cir. 1981). This process requires the Commissioner to consider, in order, whether a claimant 1) is working; 2) has a severe impairment; 3) has an impairment that meets or equals the requirements of a listed impairment; 4) can return to her past relevant work; and 5) if not, whether she can perform other work.  *See* 20 C.F.R. §§ 404.1520, 416.920 (2005).  If the Commissioner finds conclusively that a claimant is or is not disabled at any point in this process, review does not proceed to the next step.  *See* 20 C.F.R. §§ 404.1520(a), 416.920(a) (2005).

Under this analysis, a claimant has the initial burden of showing that she is unable to return to her past relevant work because of her impairments.  Once the claimant establishes a prima facie case of disability, the burden shifts to the Commissioner.  To satisfy this burden, the Commissioner must then establish that the claimant has the residual functional capacity, considering the claimant's age, education, work experience and impairments, to perform alternative jobs that exist in the national economy.  *See* 42 U.S.C.A. §§ 423(d)(2)(A), 1382c(a)(3)(A)-(B) (West 2003 & Supp. 2005); *McLain v. Schweiker*, 715 F.2d 866, 868-69 (4th Cir. 1983); *Hall*, 658 F.2d at 264-65; *Wilson v. Califano*, 617 F.2d 1050, 1053 (4th Cir. 1980).

As stated above, the court's function in this case is limited to determining whether substantial evidence exists in the record to support the ALJ's findings.  This court must not weigh the evidence, as this court lacks authority to substitute its judgment for that of the Commissioner, provided her decision is supported by substantial evidence.  *See Hays*, 907 F.2d at 1456.  In determining whether substantial

-8-

evidence supports the Commissioner's decision, the court also must consider whether the ALJ analyzed all of the relevant evidence and whether the ALJ sufficiently explained his findings and his rationale in crediting evidence. *See Sterling Smokeless Coal Co. v. Akers*, 131 F.3d 438, 439-40 (4th Cir. 1997).

Thus, it is the ALJ's responsibility to weigh the evidence, including the medical evidence, in order to resolve any conflicts which might appear therein. *See Hays,* 907 F.2d at 1456; *Taylor v. Weinberger*, 528 F.2d 1153, 1156 (4th Cir. 1975). While an ALJ may not reject medical evidence for no reason or for the wrong reason, *see King v. Califano*, 615 F.2d 1018, 1020 (4th Cir. 1980), an ALJ may, under the regulations, assign no or little weight to a medical opinion, even one from a treating source, based on the factors set forth at 20 C.F.R. §§ 404.1527(d), 416.927(d) if he sufficiently explains his rationale and if the record supports his findings.

In her brief, Adams argues that the ALJ erred by accepting the opinions of Drs. Bendigo and Griffin over that of Dr. Kiser, her treating physician, in reaching his disability determination. (Memorandum In Support Of Plaintiff's Motion For Summary Judgment, ("Plaintiff's Brief"), at 19-20.) Adams also argues that the ALJ erred by failing to find that her hypertension and carpal tunnel syndrome constituted severe impairments. (Plaintiff's Brief at 20-23.) Adams further argues that the ALJ erred by accepting the opinions of Dr. Blackwell over those of her treating physician, Dr. Kiser. (Plaintiff's Brief at 9-19.) Finally, Adams argues that the ALJ erred by failing to show that she could perform alternative jobs existing in significant numbers in the national economy. (R. at 23-32.)

Adams first argues that the ALJ erred by considering the testimony of Dr. Edward Griffin, M.D., the medical expert who testified at her October 31, 2000, hearing, as well as the opinion of Dr. Leopoldo Bendigo, M.D., over that of her treating physician, Dr. Kenneth Kiser, M.D. (Plaintiff's Brief at 19-20.) Regarding Adams's allegations of disabling hypertension, I find that the ALJ did improperly consider Dr. Griffin's testimony in finding that it did not constitute a severe impairment. In his May 27, 2004, decision, the ALJ concluded that Adams's hypertension was under good control with medication. Specifically, he noted Dr. Griffin's testimony from the prior hearing that Adams's blood pressure was somewhat labile, at times being very well controlled, while at others being very poorly controlled. (R. at 15.) However, the ALJ further noted that Dr. Griffin had testified that there was evidence that Adams was noncompliant with her medication, including not taking the medication at all for financial reasons, as well as taking the medication only once daily, as opposed to twice daily, as instructed by her physician. (R. at 15.) The ALJ stated that Dr. Griffin testified that this could explain Adams's labile blood pressure readings. (R. at 15.) The ALJ next noted that Dr. Griffin previously testified that there was no evidence of any end organ disease. (R. at 15.) Finally, the ALJ noted that an echocardiogram performed in 1997 was normal and that medical records from November 2000 revealed that Adams's blood pressure was in good control with medication. (R. at 15.) The ALJ concluded his findings regarding Adams's hypertension by stating "[t]herefore, for all the foregoing reasons, the Administrative Law Judge concludes that the claimant's allegation of disabling high blood pressure results in no more than minimal limitations and is therefore 'not severe.'" (R. at 15.)

It is clear from this most recent decision that the evidence relied upon by the

ALJ is not relevant to this court's disability determination. As previously noted, Dr. Griffin's testimony was from a prior hearing and at a time not relevant to the claims currently before this court. Likewise, the normal 1997 echocardiogram clearly is irrelevant to the time period from November 17, 2000, through May 27, 2004. Finally, while it is unclear from the ALJ's decision the exact date of the November 2000 medical records allegedly showing that Adams's hypertension was controlled with medication, thereby leaving open the possibility that they could have been from the period from November 17, 2000, through November 30, 2000, this evidence, by itself, simply would not be sufficient to constitute substantial evidence to support the ALJ's finding that Adams's hypertension was not severe within the meaning of the Act. I note that, while the record is replete with evidence relating to the status of Adams's hypertension during the time period currently before this court, this evidence may not now be considered by this court in determining whether substantial evidence supports the ALJ's finding that Adams's hypertension was not severe. Instead, only evidence considered by the ALJ may be considered by this court in determining whether substantial evidence supports the ALJ's findings. *See Hughes v. Barnhart*, 206 F. Supp. 2d 771, 781 (W.D. Va. 2002) (holding that a district court may not affirm the Commissioner's final decision upon grounds not relied upon by the Commissioner, even if those grounds are supported by the record); *see also Sterling Smokeless Coal*, 131 F.3d at 439-40 (holding that in determining whether substantial evidence supports the Commissioner's decision, the court also must consider whether the ALJ analyzed *all* of the *relevant* evidence and whether the ALJ sufficiently explained his findings and his rationale in crediting evidence).

For these reasons, I cannot find that substantial evidence supports the ALJ's

finding that Adams's hypertension was not severe within the meaning of the Act at any time from November 17, 2000, through May 27, 2004.

Unlike the ALJ's finding regarding Adams's hypertension, I note that the ALJ's findings pertinent to Adams's other alleged impairments, including carpal tunnel syndrome, were not based primarily on irrelevant evidence. While the ALJ did set forth Dr. Griffin's prior testimony relating to many of Adams's alleged impairments, he did not do so with regard to her alleged carpal tunnel syndrome. Moreover, the ALJ prefaced his inclusion of Dr. Griffin's prior testimony in his decision by stating that he was merely doing so because it provided a good summary of the medical evidence at the time of the prior hearing. Apparently, the ALJ did so for purposes of doing nothing more than setting out adequate background information, as he went on to discuss other medical evidence clearly relevant to Adams's current claims in support of his conclusions. Because Adams specifically argues in her brief that the ALJ erred by failing to find that her carpal tunnel syndrome constituted a severe impairment, I will now address whether substantial evidence supports the ALJ's finding on that issue.

In finding that Adams did not suffer from severe carpal tunnel syndrome, the ALJ stated that Adams had not undergone surgery and had not fully complied with treatment therefor. (R. at 16.) Specifically, the ALJ noted that, although Adams reported an exacerbation of her symptoms in May 2002, she further reported that she had stopped taking her medication and had not been wearing her wrist splints at night as prescribed. (R. at 16, 333.) Nonetheless, an examination revealed no more than tenderness of the hands and fingers bilaterally. (R. at 333.) Dr. Kiser again prescribed

-12-

medication and advised Adams to wear wrist splints at night. (R. at 333.) In addition, I note that neither Dr. Kiser, nor any other medical source contained in the record, ever placed any restrictions on Adams's physical abilities as a result of her alleged carpal tunnel syndrome. Moreover, Dr. Kevin Blackwell, D.O., opined during a consultative examination in June 2001 that, even giving Adams the benefit of the doubt that she suffered from true carpal tunnel syndrome, which had not been objectively identified, would result in Adams being only "somewhat limited" in the fine motor movements of the hands. (R. at 302.) Finally, while Adams testified that Dr. Kiser had mentioned the possibility of surgery for her carpal tunnel syndrome, no such mention was made in the treatment notes from the time period currently before this court.

For all of these reasons, I find that the ALJ's conclusion that Adams's alleged carpal tunnel syndrome did not constitute a severe impairment under the Act is supported by substantial evidence of record.

Although Adams argues in her brief that the ALJ further erred by considering the opinion of Dr. Leopoldo Bendigo, M.D., in reaching his disability determination, I disagree. In the most recent decision, the ALJ noted that Dr. Griffin previously testified that he concurred with the physical assessment completed by Dr. Bendigo. (R. at 17.) However, the ALJ only noted Dr. Bendigo's assessment in the section in which he was merely summarizing Dr. Griffin's previous testimony in order to provide a summary of the evidence at the time of the prior hearing. (R. at 17.) Thus, I find that Adams simply is incorrect in her contention that the ALJ improperly considered Dr. Bendigo's findings and opinions in reaching his nondisability

determination.

With regard to the remainder of Adams's arguments, I find that substantial evidence supports the ALJ's weighing of the medical evidence. Specifically, Adams argues that the ALJ erred by accepting the opinions of Dr. Blackwell over those of her treating physician, Dr. Kiser. (Plaintiff's Brief at 9-19.)

The ALJ must consider objective medical facts and the opinions and diagnoses of both treating and examining medical professionals, which constitute a major part of the proof in disability cases. *See McLain*, 715 F.2d at 869. The ALJ must generally give more weight to the opinion of a treating physician because that physician is often most able to provide "a detailed, longitudinal picture" of a claimant's alleged disability. 20 C.F.R. §§ 404.1527(d)(2), 416.927(d)(2) (2005). However, "circuit precedent does not require that a treating physician's testimony 'be given controlling weight.'" *Craig v. Chater*, 76 F.3d 585, 590 (4th Cir. 1996) (quoting *Hunter v. Sullivan*, 993 F.2d 31, 35 (4th Cir. 1992)). In fact, "if a physician's opinion is not supported by the clinical evidence or if it is inconsistent with other substantial evidence, it should be accorded significantly less weight." *Craig*, 76 F.3d at 590.

Here, the ALJ specifically stated that he had considered the opinions of Dr. Patrick Molony, M.D., Dr. Kiser, Dr. Blackwell and the state agency physicians in reaching his nondisability determination. (R. at 20.) He further stated that the assessments of Dr. Molony and Dr. Kiser were of little probative value and that he was granting greater weight to the opinions of Dr. Blackwell and the state agency physicians. (R. at 20.) The ALJ noted that he was essentially rejecting Dr. Molony's

-14-

findings because the significant restrictions he imposed on Adams were not supported by radiographic findings or by Dr. Kiser's treatment records. (R. at 20.) The ALJ further noted that Dr. Molony had neither evaluated nor seen Adams since August 2000. (R. at 20.) He noted that both Dr. Kiser's and Dr. Molony's restrictions appeared to be based on Adams's subjective allegations instead of on the objective evidence of record. (R. at 20.) Finally, the ALJ noted that the opinions of Dr. Blackwell and the state agency physicians were generally consistent with a residual functional capacity for a diminished range of light work as he ultimately found. (R. at 20.) For the following reasons, I find that substantial evidence supports the ALJ's weighing of the medical evidence.

For purposes relevant to this court's decision, Adams saw Dr. Kiser from December 2000 to January 2004 with various complaints, including hypertension, gastroesophageal reflux disease, ("GERD"), carpal tunnel syndrome, low back pain, shoulder pain, chest pressure, weakness and swelling in the face, hands and feet, intermittent vertigo, a right breast nodule, pain in the elbows, wrists, hands and knees and exacerbation of asthma. (R. at 319-41.) Nonetheless, physical examinations consistently revealed clear lungs, normal cardiovascular function and normal extremity examinations. (R. at 319-41.) Over this time, Adams exhibited some shoulder tenderness, low back tenderness, distal interphalangeal and proximal interphalangeal joint tenderness and lumbar spasm. (R. at 326, 329, 332-34, 337, 340.) It appears from Dr. Kiser's treatment notes that Adams's complaints of back pain were "intermittent" with no evidence of a change in bowel or bladder function. (R. at 326, 333, 337.) Moreover, despite complaints of exacerbation of carpal tunnel syndrome, Adams admitted that she had stopped taking her medication and had not

-15-

been wearing her wrist splints at night. (R. at 333.) There is no evidence that Dr. Kiser ever discussed the possibility of surgery for Adams's carpal tunnel syndrome symptoms during the time period at issue. Regarding Adams's complaints of shoulder pain, she was diagnosed with bursitis and biceps tendonitis, and arrangements were made for physical therapy. (R. at 331-32.) On March 19, 2003, a wrist examination was normal. (R. at 327.) Adams was treated conservatively with medications for her various complaints, and Dr. Kiser imposed no restrictions on Adams's physical activities over this time period.

Despite these relatively mild findings contained in Dr. Kiser's treatment notes, he completed an assessment in January 2004 indicating that Adams could sit for a total of three hours during an eight-hour workday, but could do so for only 15 minutes without interruption. (R. at 354-57.) He further found that she could stand or walk for a total of two hours in an eight-hour workday, but for only 15 minutes without interruption. (R. at 355.) Furthermore, in addition to a morning break, a lunch break and an afternoon break, all scheduled at two-hour intervals, Dr. Kiser concluded that Adams would need to rest for a total of three hours during an eight-hour workday in order to alleviate her pain. (R. at 355-56.) He further concluded that Adams could lift items weighing up to only five pounds occasionally and that she could rarely or never stoop. (R. at 356-57.) Dr. Kiser noted that these restrictions were based on Adams's diagnoses of a posterior bulge at the L4-L5 level of the spine indenting the dorsal sac, intermittent voiding incontinence, intermittent vaginal numbness and asthma. (R. at 357.)

For these reasons, I find that Dr. Kiser's January 2004 assessment simply is not

-16-

supported by his own treatment notes. Moreover, there is no objective medical evidence of record to support the imposition of such harsh restrictions on Adams's physical abilities. The only radiographic evidence relevant to the time period at issue was x-rays of Adams's spine, taken on June 29, 2001, which showed only degenerative changes and disc space narrowing at the L4-L5 level with some scattered degenerative spurring. (R. at 304-05.)

Furthermore, Dr. Kiser's findings are not supported by Dr. Blackwell's consultative examination performed on June 29, 2001. At that time, Adams reported low back pain, reportedly caused by a ruptured disc at the L4-L5 level of the spine, right leg pain and weakness, carpal tunnel syndrome, occasional chest pain and pressure and hypertension. (R. at 299-300.) Adams's blood pressure was 140/90 at that time. (R. at 301.) Dr. Blackwell noted that Adams appeared to have some exaggerated response to pain while performing activities, but further noted that she did not appear to be in any significant acute distress. (R. at 301.) Her lungs were clear, her extremities were normal, she had a normal cardiac examination and her gait was symmetrical and balanced. (R. at 301.) Dr. Blackwell noted a considerable amount of tenderness over the cervical, thoracic and lumbar spines with the slightest palpation. (R. at 301-02.) However, no spasm or deformities were noted. (R. at 302.) She had a good range of motion in a seated position with some limitation on forward flexion. (R. at 302.) A joint examination of the upper and lower extremities was normal, and no swelling, tenderness or restriction of motion was noted. (R. at 302.) Deep tendon reflexes of the upper and lower extremities were within normal limits, but some tenderness with forward flexion and squatting was noted. (R. at 302.)

-17-

Dr. Blackwell diagnosed Adams with low back pain, carpal tunnel syndrome by history, angina by history and fibrocystic breast disease. (R. at 302.) He noted that he could not rule out some degree of symptom magnification. (R. at 302.) Dr. Blackwell opined that Adams had some limitation with full squats and crawling on the knees, and he stated that she should avoid ladder climbing. (R. at 302.) Dr. Blackwell further noted that if Adams had a true disc herniation, of which there was no objective medical evidence, she would be limited to lifting items weighing up to 25 pounds frequently and a maximum of up to 30 pounds. (R. at 302.) Dr. Blackwell further found that Adams could sit for eight hours in an eight-hour workday and stand for six hours in an eight-hour workday with positional changes every one and one-half to two hours. (R. at 302.) Likewise, Dr. Blackwell opined that if true carpal tunnel syndrome was identified, Adams's fine motor movements of the hands may be somewhat limited. (R. at 302.) However, on physical examination, Dr. Blackwell noted only some tenderness with palmar and dorsiflexion of the wrist without swelling or abnormalities and no limitations at the time of the evaluation. (R. at 302-03.) Dr. Blackwell further noted that Adams's chest discomfort was due to worry. (R. at 303.) Thus, he opined that she might need a stress/depression evaluation, but that given her then-current medications, there were no significant cardiac limitations at that time. (R. at 303.)

Contrary to Dr. Kiser's and Dr. Molony's findings, Dr. Blackwell's findings are consistent with his own narrative report as well as with the testing performed during the evaluation and the radiographic findings of the same day. Dr. Blackwell clearly did not rely solely on Adams's subjective allegations, but, instead, properly relied on the objective medical evidence of record in reaching his findings.

-18-

Likewise, the findings of state agency physicians Dr. Richard M. Surrusco, M.D., and Dr. Donald R. Williams, M.D., on July 17, 2001, and January 10, 2002, respectively, support Dr. Blackwell's findings and are consistent with the objective medical evidence of record. The state agency physicians concluded that Adams could perform light work diminished by an ability to occasionally climb, balance, stoop, kneel, crouch and crawl. (R. at 308-15.) They imposed no manipulative, visual, communicative or environmental limitations. (R. at 311-12.) Drs. Surrusco and Williams concluded that Adams's allegations were only partially credible. (R. at 313.)

Dr. Patrick Molony, M.D., completed a Physical Assessment Of Ability To Do Work-Related Activities on August 3, 2002.[7] (R. at 316-18.) Dr. Molony concluded that Adams could lift and carry items weighing up to five pounds occasionally and could stand and/or walk for a total of four hours in an eight-hour workday, but for only one to one and one-half hours without interruption. (R. at 316.) Dr. Molony found that Adams could sit for a total of six hours in an eight-hour workday, but for only two hours without interruption. (R. at 317.) He further found that Adams could occasionally climb, but never stoop, kneel, crouch or crawl. (R. at 317.) Next, Dr. Molony found that Adams's abilities to feel and to push and/or pull were affected by her impairments. (R. at 317.) He concluded that Adams should not work around heights, moving machinery, temperature extremes or humidity. (R. at 318.) Dr. Molony noted that he was basing these limitations on Adams's back pain, leg pain and weakness and shoulder pain. (R. at 316-18.)

---

[7] I note that the ALJ incorrectly stated in his decision that this assessment was completed in August 2000. (R. at 20.)

As the ALJ noted in his decision, Dr. Molony's findings appear to be improperly based on Adams's subjective allegations, as opposed to objective medical evidence. Unlike Dr. Blackwell, Dr. Molony performed no testing of Adams during the evaluation. Thus, although he noted that he was basing the imposed limitations upon Adams's back pain, leg pain and weakness and shoulder pain, these were merely the subjective complaints as alleged by Adams at the time of the assessment. Moreover, like the harsh limitations imposed by Dr. Kiser, those imposed by Dr. Molony are not supported by any radiographic evidence.

For all of the above-stated reasons, I find that, while substantial evidence supports the ALJ's rejection of Dr. Kiser's and Dr. Molony's opinions in favor of those of Dr. Blackwell and the state agency physicians, substantial evidence does not support the ALJ's failure to find that Adams's hypertension did not constitute a severe impairment within the meaning of the Act at any time from November 17, 2000, through May 27, 2004. Therefore, I find it unnecessary to address Adams's remaining arguments.

## PROPOSED FINDINGS OF FACT

As supplemented by the above summary and analysis, the undersigned now submits the following formal findings, conclusions and recommendations:

1.     Substantial evidence does not support the ALJ's finding that Adams's hypertension did not constitute a severe impairment; and

-20-

2. Substantial evidence does not support the ALJ's finding that Adams was not disabled under the Act and was not entitled to benefits.

## RECOMMENDED DISPOSITION

The undersigned recommends that the court deny Adams's and the Commissioner's motions for summary judgment, vacate the decision denying benefits and remand the case to the ALJ for further consideration to determine the severity of Adams's hypertension during the time period from November 17, 2000, through May 27, 2004.

## <u>Notice to Parties</u>

Notice is hereby given to the parties of the provisions of 28 U.S.C.A. § 636(b)(1)(c) (West 1993 & Supp. 2005):

> Within ten days after being served with a copy [of this Report and Recommendation], any party may serve and file written objections to such proposed findings and recommendations as provided by rules of court. A judge of the court shall make a de novo determination of those portions of the report or specified proposed findings or recommendations to which objection is made. A judge of the court may accept, reject, or modify, in whole or in part, the findings or recommendations made by the magistrate judge. The judge may also receive further evidence or recommit the matter to the magistrate judge with instructions.

Failure to file timely written objections to these proposed findings and recommendations within 10 days could waive appellate review. At the conclusion of the 10-day period, the Clerk is directed to transmit the record in this matter to the Honorable James P. Jones, Chief United States District Judge.

-21-

The Clerk is directed to send certified copies of this Report and Recommendation to all counsel of record at this time.

DATED:     This 10th day of January 2006.

/s/  *Pamela Meade Sargent*

UNITED STATES MAGISTRATE JUDGE

-23-